**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **VEATH FISH FARM, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **PURINA ANIMAL NUTRITION, LLC,** | ) | **Case No. 17–cv–0303–MJR–SCW** |
| **and TEXAS FARM PRODUCTS CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM & ORDER

**REAGAN, Chief District Judge:**

### I. INTRODUCTION

This matter is before the Court on Motions to Dismiss by Defendants Purina Animal Nutrition, LLC ("Purina") (Docs. 31, 32), and Texas Farm Products Co. ("Texas Farm") (Docs. 25, 26, 27). The essence of the dispute is a claim by Veath Fish Farm, LLC ("Veath") that Purina and Texas Farm both harmed Veath by selling commercial fish feed that caused a significant number of Veath's largemouth bass to die. Veath seeks to proceed under theories of: breach of the Illinois Consumer Fraud Act ("ICFA"), breach of various warranties, and negligence. In total, the Complaint contains five counts against Purina and four against Texas Farm (Docs. 1, 16). This Court enjoys diversity jurisdiction under 28 U.S.C. § 1332 because Veath is an Illinois corporation, Purina is a Delaware corporation (with a primary place of business in Minnesota), and Texas Farm

is a Texas corporation.  For the reasons set forth below, the Court GRANTS the Motion to Dismiss as to two counts, and DENIES the motion as the other seven counts.

## II.    PROCEDURAL & FACTUAL BACKGROUND

In June 2015, Plaintiff's largemouth bass farm was home to about 360,000 bass of varying sizes and ages (Doc. 16 at 3).  Many fish are sold at age three; though a portion of the one- and two-year-old fish are sold annually (*Id.*).  Plaintiff has been purchasing fish food distributed by Purina since 2008.  Up until June of 2015, Purina and other suppliers worked together to produce the feed Plaintiff purchased—namely, AquaMax 500 and AquaMax 600.  Plaintiff alleges that in June of 2015 Defendant Texas Farm began producing the AquaMax 500 and 600 feed for Purina.  The change in manufacturer was allegedly accompanied by a change in the formula of the food— though it is alleged that consumers were not notified of the reformulation (*Id.* at 3-4, 7).

Plaintiff alleges that the new formulation produced by Texas Farm contained, among other things, higher percentages of digestible carbohydrates than largemouth bass can physically absorb (*Id.* at 7-8).  According to Plaintiff, the higher carbohydrate percentages cause liver damage in largemouth bass.  Despite the reformulation, the statements, representations, guaranties, and warranties on the packaging of AquaMax 500/600 and on the Defendants' web pages, continued to represent that the food was "100% NUTRITIONALLY COMPLETE TO MAXIMIZE GROWTH" for largemouth bass (*Id.* at 8) (emphasis in original).  Purina and Texas Farm made many similar

representations regarding the quality and composition of the feed on websites, on packaging, and by Purina via sales representatives (*Id.* at 5-8). A number of specific statements are excerpted in the Complaint, but it is not necessary to repeat those statements here to assess the motions pending before the Court (*See id.*).

Plaintiff apparently relied on the representations made by Texas Farm and Purina when purchasing feed for its largemouth bass (*Id.* at 8-9). Plaintiff contends that Texas Farm and Purina failed to warn consumers of the reformulation (*Id.* at 7-8). Prior to Texas Farm allegedly reformulating the AquaMax feed, Plaintiff encountered no significant problems with the AquaMax feed (*Id.* at 7). By contrast, post-reformulation, by April of 2016 Plaintiff experienced significant disease and death amongst the largemouth bass population (*Id.* at 9). Plaintiff alleges that the substantial population problems were a direct and proximate result of feeding the fish the reformulated AquaMax 500 and 600 feed (*Id.*). According to Plaintiff, the feed was not consistent with the representations of nutritional adequacy because of the heightened carbohydrate percentages (*Id.*).

Plaintiff's nine-count Complaint contains: two counts of fraud under the Illinois Consumer Fraud Act (I, VI), one count of breach of express warranty against Purina (Count II), two counts of breach of implied warranty of merchantability (III, VII), two counts of breach of implied warranty of fitness for a particular purpose (IV, VIII), and two counts of negligence (V, IX) (*Id.* at 9-21). Plaintiff seeks compensatory and punitive

damages, as well as costs and any additional relief the Court deems just and proper (*Id.* at 21).

Defendants Texas Farm and Purina filed separate motions to dismiss, though many of the arguments presented are identical or very similar.  For brevity, the Court will group the arguments for dismissal, including a citation to both motions.  Plaintiff's claims rely on three major theories of relief—the Illinois Consumer Fraud Act ("ICFA"), warranties based on contract law, and negligence based on tort law.  Defendants argue for dismissal of the ICFA claims based on a statutory exception and a lack of privity; of the warranty claims based on lack of privity and the inapplicability of exceptions; and of the negligence claims based on the economic loss doctrine.  In reply, Plaintiff points to a number of exceptions that arguably may apply to allow it a broad scope of relief.  The particulars of these arguments will be discussed in greater detail below in the legal analysis portion of this memorandum.

It is clear from the briefing before the Court that any number of exceptions *could* apply to the facts at hand.  There are exceptions that could conceivably work in the favor of either side.  It is apparent that Plaintiff is highly unlikely to, or is legally barred from, succeeding on all three theories of relief simultaneously.  So as the case unfolds, and discovery is conducted, the Court expects to gain greater clarity about the merits of various exceptions.  For the time being, the Court reviewed the case with a narrow eye

towards the motion to dismiss standard, ensuring only that it is feasible in some scenario on the facts pled that a viable claim could exist.

### III. STANDARD OF REVIEW

This Court accepts all factual allegations as true when reviewing a 12(b)(6) motion to dismiss. *Erickson v. Pardus*, **551 U.S. 89, 94 (2007).** To avoid dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim sufficient to show entitlement to relief and to notify the defendant of the allegations made against him. FED. R. CIV. P. **8(a)(2)**; *Bell Atl. Corp. v. Twombly*, **550 U.S. 544, 555-57 (2007).** To meet this standard, a complaint must describe the claims in sufficient factual detail to suggest a right to relief beyond a speculative level. *Id.; Ashcroft v. Iqbal*, **556 U.S. 662, 678 (2009);** *EEOC v. Concentra Health Servs.*, **496 F.3d 773, 776 (7th Cir. 2007).** A complaint need not contain detailed factual allegations, *Scott v. Chuhak & Tescon, P.C.*, **725 F.3d 772, 782 (7th Cir. 2013)**, but it must go beyond "mere labels and conclusions" and contain "enough to raise the right to relief above the speculative level," *G&S Holdings, LLC v. Cont'l Cas. Co.*, **697 F.3d 534, 537-38 (7th Cir. 2012).**

The Seventh Circuit has outlined the boundaries of 12(b)(6) with two major principles. First, although facts in the pleadings must be accepted as true and construed in the plaintiff's favor, allegations in the form of legal conclusions are insufficient to survive a motion to dismiss. *McReynolds v. Merrill Lynch & Co., Inc.*, **694 F.3d 873, 885**

**(7th Cir. 2012).** And, second, "the plausibility standard calls for a 'context-specific' inquiry that requires the court 'to draw on its judicial experience and common sense.'" *Id.* Threadbare recitals of elements and conclusory statements are not sufficient to state a claim. *Id.* Put another way, to survive a motion to dismiss "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together [. . .] the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, **614 F.3d 400, 404 (7th Cir. 2010).**

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pled with particularity—a heightened standard of pleading. *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Serv., Inc.*, **536 F.3d 663, 668 (7th Cir. 2008).** Particularity requires alleging the circumstances of fraud or mistake, including: "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* **(internal citation omitted).** The complete lack of information about the timing, place, or manner of communicating alleged misrepresentations may render a claim insufficiently pled, particularly where the plaintiffs are the alleged audience for the misrepresentations. *See Gandhi v. Sitara Capital Mgmt., LLC*, **721 F.3d 865, 870 (7th Cir. 2013).**

## IV.  ANALYSIS

### A.  ICFA

Defendants contend that Plaintiff cannot state a claim under the Illinois Consumer Fraud Act ("ICFA") because the facts fall squarely within an exception to the statute (Section 10(b)(5)) that prohibits plaintiffs from recovering for damage to property other than the property that is the subject of the allegedly unlawful practice (Doc. 26 at 5-6; Doc. 32 at 5-6).  Applied to this case, the exception prohibits Plaintiff from seeking to recover for lost fish where the allegedly unlawful conduct relates directly to *fish food, not fish* (Doc. 26 at 5-6; Doc. 32 at 5-6).  Second, Defendants argue that the ICFA claims fail because they are merely duplicitous of available contractual relief (Doc. 26 at 6; Doc. 32 at 6).  Defendant Purina additionally contends that if the Court allows a breach of express warranty claim to proceed, then the ICFA claim should be dismissed as duplicitous (Doc. 32 at 6, note 2).

Plaintiff responded to each motion to dismiss in turn, though both responses are nearly identical (Docs. 35, 36).  As to the allegation that an exception to ICFA precludes Plaintiff's claims, Plaintiff responded that the cited exception was overruled by the Illinois Supreme Court in 1997 when the Court held that Public Act 89-7 was unconstitutional in its entirety (thus voiding Section 10(b)(5) cited by Defendants) (Doc. 35 at 2-3; Doc. 36 at 2-3).  In support of its position, Plaintiff cites two Northern District of Illinois cases allowing ICFA claims to proceed against dog treat manufacturers for

harm to dogs caused by bad treats (Doc. 35 at 3; Doc. 36 at 3).  *See Bietsch v. Sergeant's Pet Care Products, Inc.,* **2016 WL 1011512 (N.D. Ill. 2016);** *Adkins v. Nestle Purina Petcare Company,* **973 F.Supp.2d 905 (N.D. Ill. 2013).**

As to the argument that the ICFA claim is precluded by the availability of a basic contract action, Plaintiff contends that its allegations go beyond contract because there are allegations of deceptive or unfair representations by the Defendants (Doc. 35 at 3-5; Doc. 36 at 3-5).  Plaintiffs cite multiple cases in support of this position, including *Greenberger v. GEICO Gen. Ins. Co.,* **631 F.3d 392, 399 (7th Cir. 2011).**  Plaintiff also contends that at this juncture it can plead alternative theories of relief (Doc. 35 at 5).

Texas Farm and Purina filed a joint reply to Plaintiff's responses (Docs. 37, 38) focused solely on the validity of the ICFA exception.  Defendants insist that the 10(b)(5) exception to ICFA is applicable in this case because it was enacted twice in 1995 and the Illinois Supreme Court only invalidated one enactment (Doc. 37 at 3-4).  Defendants bolster this assertion by citing to other provisions of enactments that have been stricken and subsequently considered by Illinois courts (*Id.*).

"To state a violation of the [Consumer Fraud Act], the plaintiffs must prove three elements: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant's intent that plaintiff rely on the deception; and, (3) the occurrence of the deception in the course of conduct involving trade or commerce."  *Parks v. Wells Fargo Home Mortgage, Inc.,* **398 F.3d 937, 943 (7th Cir. 2005).**  Like any fraud claim in Illinois, a

plaintiff must plead a consumer fraud claim with particularity by alleging the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. *Bankers Trust Co. v. Old Republic Ins. Co.*, **959 F.2d 677, 683-84 (7th Cir. 1992).** Though there may be flexibility in the pleading standard where the plaintiffs allege that they do not have access to the information needed to show a fraud, the flexibility is not so great that plaintiffs can satisfy the particularity requirement by simply asserting that on "information and belief" the defendants committed consumer fraud. *Id.*

In *Greenberger*, the Seventh Circuit clearly held that a claim cannot proceed under the ICFA if it is a mere duplicate of available contract-based claims.

> When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract…a deceptive act or practice involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract.

*Greenberger*, **631 F.3d at 399 (internal quotations and citations omitted).** The *Greenberger* Court concluded that it was not the existence of a contract that prevented the plaintiff from bringing an ICFA claim, but rather the lack of any distinct allegations of unfair or deceptive conduct in the contractual setting that prevented the claim.

Here, the Plaintiff alleges that Defendants violated ICFA by falsely representing that their AquaMax fish food products were nutritionally optimal for largemouth bass. Plaintiff alleges that it relied on this statement in feeding its fish the AquaMax products,

and that, as a result the fish died because the feed was not nutritionally adequate. These allegations satisfy the basic components of an ICFA claim—that a defendant engage in a deceptive act or practice; with the intent the plaintiff rely on the deception; in the course of trade; and that the deception proximately caused harm to the plaintiff. *See e.g. IWOI, LLC v. Monaco Coach Corp.,* **581 F.Supp.2d 994, 1002 (N.D. Ill. 2008).** Defendants argue that a plaintiff cannot bring such a claim against a manufacturer, but Illinois law contradicts this argument. *See id.* The ICFA claim also circumvents the *Greenberger* problem because Plaintiff seeks to recover for loss of the fish—something above and beyond the AquaMax product itself. However, the basic components of an ICFA claim are not the Plaintiff's only problem according to the Defendants.

In 1995 the Illinois Legislature passed Public Act 89-7, which contained 815 ILCS 505/10(b)(5). Section 10(b)(5) provided that "[c]laims seeking damages for conduct that results in bodily injury, death, or damage to property other than the property that is the subject of the practice claimed [are] unlawful." The language of Section 10(b)(5) does appear directly applicable to this case, but, the validity of that language is subject to question because the Public Act containing this provision was held unconstitutional by the Illinois Supreme Court in 1997. *See Best v. Taylor Machine Works,* **689 N.E.2d 1057 (Ill. 1997).**

Interestingly, Defendants point to Public Act 89-152—a second Public Act passed in 1995 that apparently contained the same Section 10(b)(5) language as 89-7. Public Act

89-152 has not been found unconstitutional, so Defendants argue that Section 10(b)(5) is still good law.  The portion of Public Act 89-152 that contains Section 10(b)(5) is focused on insurance producers.  Public Act 89-152 contains the following underlined changes to Section 10(b)(5) and also adds Section 10(b)(6) anew:

> Nothing in this Act [i.e., the Consumer Fraud Act] shall apply to <u>any of the following:</u>
> [...]
> (5) Claims seeking damages for conduct that results in bodily injury, death, or damage to property other than the property that is the subject of the practice claimed to be unlawful.  <u>This item (5)</u> applies to causes of action filed on or after its effective date.
> (6) The communication of any false, misleading, or deceptive information by an insurance producer, registered firm, or limited insurance representative, as those terms are defined in the Illinois Insurance Code, or by an insurance agency or brokerage house concerning the sale, placement, procurement, renewal, binding, cancellation of, or terms of any type of insurance or any policy of insurance unless the insurance producer has actual knowledge of the false, misleading, or deceptive character of the information.  This provision shall be effective as to any communications, whenever occurring.  This item (6) applies to all causes of action that accrue on or after the effective date of this amendatory Act of 1995.

P.A. 89-152 (S.B. 977) (approved Jul. 14, 1995) (underlining in original).  Aside from the underlined text, Section 10(b)(5) as contained in 89-152 is consistent with Section 10(b)(5) in Public Act 89-7.  Defendants argue that Section 10(b)(5) is still good law by distinguishing it from a case where the Illinois Supreme Court examined the legitimacy of another portion of Public Act 89-7 that parties tried to rely on after the 1997 *Best* decision.

In *O'Casek v. Children's Home and Aid Society of Illinois*, **892 N.E.2d 994 (Ill. 2008)**, the Illinois Supreme Court addressed the medical malpractice provision of Public Act 89-7 that was found unconstitutional in *Best* but appeared to be revived by a 1998 Public Act. The medical malpractice language existed prior to 1995. In 1995, Public Act 89-7 edited the medical malpractice text. The Illinois Supreme Court then found the entire Public Act 89-7 unconstitutional. In 1998, a subsequent public act used the medical malpractice language that had appeared in public act 89-7 without any mention of the *Best* unconstitutionality holding. The *O'Casek* Court engaged in a very detailed analysis of legislative history, statutory construction, and legal reasoning. The Court ultimately concluded that the use of the 1995 unconstitutional text was a mere legislative oversight, and that the latter Public Act did not re-enact the unconstitutional text. Notably, the Court stated, "we will not construe the mere iteration of a prior law as a new enactment." *Id.* **at 1012.**

Here, Defendants argue that because section 89-152 was not a reiteration of previously stricken text, but was instead a separate iteration, it is still valid law. Though Defendants' argument is clever, this Court is not persuaded that two enactments of identical text both *pre-dating* the *Best* unconstitutionality finding demonstrate an intent by the Legislature that Section 10(b)(5) survive *Best*. The minor textual alterations identified by Defendants as distinguishing 89-7's version of 10(b)(5) from 89-152 are stylistic and are designed to make the text flow with the addition of

Section 10(b)(6).  The Court is not persuaded that these stylistic changes evidence an intent to change anything substantive about 89-7's version of 10(b)(5) or to bolster the legal force of Section 10(b)(5).  It may be a closer call if, as in *O'Casek*, one Public Act containing 10(b)(5) came before *Best* and one came after, but that is not the situation here.  Multiple other federal courts have allowed ICFA claims to proceed against manufacturers for harm to property other than the product at issue suggesting that Section 10(b)(5) is dead, and this Court is inclined to follow suit.  **See e.g., Bietsch, 2016 WL 1011512 (case about bad dog treats);** *Adkins,* **973 F.Supp.2d 905 (case about bad dog treats).**

In light of the holdings of other federal courts, this Court is also not persuaded that privity is a prerequisite to an ICFA action against a manufacturer.  **See e.g. IWOI, LLC, 581 F.Supp.2d at 1004 ("manufacturers can be liable under the [ICFA] when they knowingly place a materially defective product into the stream of commerce whether or not they are in privity of contract with or communicate directly to the end consumer").**  Finally, this Court agrees that at this point Plaintiff can plead alternative theories of relief, so Defendant Purina's argument that Plaintiff cannot simultaneously recover under ICFA and an express warranty claim is premature.  Thus, the motions to dismiss counts I and VI of the complaint are DENIED.

## B. Breach of Express and implied warranties

Purina—the only defendant subject to a breach of express warranty claim—argues that it cannot be subject to said claim because there is no privity of contract between it and Plaintiff (Doc. 32 at 10-11).  Plaintiff's Complaint does not identify the direct seller of the fish food, thus, Purina alleges that the express warranty claim fails as a matter of law (*Id.*).

As to the implied warranty claims, Defendants both argue that these claims cannot proceed because there is not privity of contract between them and Plaintiff in the sale of the fish feed (Doc. 26 at 9-12; Doc. 32 at 10-12).  Three exceptions to the general privity requirements do not apply here because Plaintiff has not tendered any facts or evidence tending to suggest an express warranty, an agency relationship, or that the feed was custom manufactured with Plaintiff in mind (*Id.*).  Neither targeted marketing and advertising, nor the fact that the fish feed came from the Defendants in sealed packaging give rise to privity, according to Defendants (Doc. 26 at 11, Doc. 32 at 12).

Additionally, Defendants contend that Plaintiff cannot state a claim for breach of an implied warranty of fitness for a particular purpose because Plaintiff used the fish feed for its ordinary purpose, to feed largemouth bass (Doc. 26 at 12-13; Doc. 32 at 13).

As to the stand-alone express warranty claim, Plaintiff argues that Purina is liable under a theory of express warranty based on the explicit representations made about AquaMax 500 and 600 on the packaging and on Purina's website (Doc. 35 at 7).

In support, Plaintiff cites a number of cases finding that representations on packaging fall within an exception to the general privity requirement (Doc. 35 at 7 (*see e.g. Bietsch*, **2016 WL 1011512**)).

Turning to the implied warranty claims, Plaintiff argues that it qualifies for an exception to the privity requirement because the product in question—fish food—came in a sealed package.  In support of this exception, Plaintiff identifies a number of cases delineating the boundaries of this exception, including cases extending this privity exception to items intended for animal consumption, *Adkins*, **973 F. Supp.2d 905;** *see also Southland Milling Co. v. Vege Fat, Inc.* **248 F.Supp 482 (E.D. Ill. 1965)** (Doc. 35 at 8; Doc. 36 at 6-7).  Alternatively, Plaintiff argues that privity is an issue of fact not appropriately resolved at the motion to dismiss phase (Doc. 35 at 8-9; Doc. 36 at 7).

Additionally, Plaintiff counters that it stated a viable claim for breach of an implied warranty of fitness for a particular purpose because the fish feed was specifically touted to feed largemouth bass (Doc. 35 at 9-10; Doc. 36 at 7-9).  Thus, Plaintiff argues, an exception to strict privity applies (Doc. 35 at 9-10; Doc. 36 at 7-9).

Under the Uniform Commercial Code ("UCC"), Section 2-313,

(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or mode which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Typically to recover for damages that result from a product not living up to an express warranty, a claimant must establish privity of contract between himself and the alleged defendant. However, Illinois courts have developed a number of exceptions to the traditional notions of privity. Relevant to this case is an Illinois appellate court's proclamation that "[w]here an article of food or drink, intended for human consumption, is sold in a sealed container, an implied warranty is imposed on the manufacturer that the article was fit for that purpose, enabling a consumer to recover for the warranty's breach." *Warren v. Coca-Cola Bottling Co. of Chicago*, **519 N.E.2d 1197, 1201-02 (Ill. App. 1988).** Federal courts interpreting this exception in Illinois law have surmised that it should also apply to products intended for animal consumption. *See e.g. Bietsch,* **2016 WL 1011512 (allowing an implied warranty claim to proceed against a dog treat manufacturer based on representations on the packaging);** *Adkins,* **973 F.Supp.2d at 922 (allowing claims to proceed against dog treat manufacturers and noting there is no reason the Illinois exception for sealed foodstuffs should be limited to products for human consumption as opposed to canines);** *Southland*

*Milling Co.*, **248 F.Supp. 482 (allowing claims against manufacturer of component of chicken feed despite lack of direct privity).**

Defendants vehemently oppose the extension of the privity exception from sealed products meant for human consumption to products intended for animal consumption. In a footnote spanning nearly an entire page, they argue that the exception must not be extended to all sealed products because courts have declined to extend the privity exception to sealed products such as baby monitoring devices. ***See e.g. Jamison v. Summer Infant, Inc.*, 778 F.Supp.2d 900, 913 (N.D. Ill. 2011) (noting that the Seventh Circuit generally recognizes a privity requirement and does not find the requirement satisfied by a written express warranty in packaging); *see also IWOI, LLC,* 581 F.Supp.2d at 1000 (noting that the Seventh circuit declined to adopt an Illinois state court practice that allowed non-privity parties to bring implied warranty claims).** They also note that the Illinois courts have declined to entirely do away with the concept of privity. They cite a number of cases evidencing this—cases about the sale of vehicles, motor homes, and prescription drugs. But the key distinction between all of the cases cited that decline to do away with the privity requirement, and the cases that make exceptions to the privity requirement is that, where exceptions are made, people or animals have been physically harmed. ***Compare IWOI, LLC ,* 581 F.Supp.2d at 1000-01; and *Williamson v. S.A. Gear Company, Inc.*, 2017 WL 283373, \*1, \*2-3 (S.D. Ill. 2017) (noting that under Illinois law a plaintiff must establish privity of contract**

between a plaintiff and manufacturer in a suit to recover economic loss); *Flynn v. FCA US LLC,* 2016 WL 5341749, *1, *7 (S.D. Ill. 2016) (noting that privity must be established for a warranty claim purely for economic loss); *with In re McDonald's French Fries Litigation,* 503 F.Supp.2d 953, 958 (N.D. Ill. 2007) (finding that because McDonald's expressly warranted to fry consumers that fries were allergen free, an exception to privity existed under Illinois law); *see also Adkins ,* 973 F.Supp.2d at 922 (finding that sealed container exception to the privity requirement for implied warranty claims can apply to dog treats as well as products for human consumption); *Bloomer Chocolate Co. v. Bongards Creameries, Inc.,* 635 F.Supp. 911 (N.D. Ill. 1985) (finding that a lack of apparent privity may not preclude warranty claims against a whey protein manufacturer selling whey contaminated by salmonella); *Southland Milling Co.,* 248 F.Supp. 482 (discussing the historical and policy based rationale for privity and deciding it did not apply to a scenario where a manufacturer of a component of poultry feed produced toxic fat).

Taking this distinction alongside Illinois case law discussing the evolution of competing tort and contract based theories of relief for product liability it is evident that Illinois courts are walking a tight rope attempting to optimize the allocation of risk between parties in a transaction. *See e.g. Moorman Mfg. Co. v. National Tank Co.,* 435 N.E.2d 443 (Ill 1982) (discussing the evolution of similar causes of action in contract law and tort law and assessing the appropriate standards to be applied to claims that

could fall into either bucket to best allocate risk); *Szajna v. General Motors Corp.*, 503 N.E.2d 760 (Ill. 1986) (discussing the appropriateness of the privity requirement in certain situations as a tool to properly allocate transactional risks). Federal courts applying Illinois law in recent years err on the side of flexibly applying the privity requirements to express and implied warranty claims where there are allegations that a product harmed animals. *See e.g. Bietsch*, 2016 WL 1011512 at *6; *Adkins*, 973 F.Supp.2d at 922. This Court agrees with this interpretation of Illinois law as an optimal way to allocate this kind of risk. The total death or serious injury caused to animals in other Illinois cases and in the case before the Court is more serious than the harm and frustration that results from a faulty product.

Turning first to Plaintiff's claim that Defendant Purina violated an express warranty, this Court will not dismiss the claim for lack of privity. Courts interpreting Illinois law have allowed claims against a manufacturer or distributor for express guarantees on the exterior of product packaging or via directed advertising. Here, Plaintiff alleges that the statements made by Purina online and in marketing materials guaranteed that the food would be nutritionally adequate. *See e.g. In re McDonald's French Fry Litigation*, 503 F.Supp.2d at 957-58 (allowing express warranty claims to proceed based on representations made about allergen contents of fries); *Bietsch*, 2016 WL 1011512 at *6 (allowing warranty claims to proceed based on product advertising about nutritional contents of dog treats). Thus, Plaintiff has identified the

essential components of an express warranty claim, so dismissal of Court II is not appropriate.

Next, as to the claims against both Defendants for implied warranty of fitness for a particular purpose, this Court finds that dismissal is appropriate. The products in this case—AquaMax 500 and 600—are fish food meant for commercial fish stocks. Plaintiff alleges that it used the food to feed commercial largemouth bass. This use was not 'particular' and there is no allegation that Plaintiff specifically approached the manufacturers to ensure that the product would do something above and beyond its normal advertised function. Absent such an assertion, the claims fail because there is no 'particular' purpose. *See e.g. In re McDonald's French Fry Litigation*, **503 F.Supp.2d at 958 (finding that plaintiffs did not allege that the fries were meant for any particular consumption, so no warranty for a particular purpose existed).** Accordingly, Counts IV and VIII are dismissed without prejudice.

Finally, as to the claims that Defendants violated an implied warranty of merchantability, UCC Section 2-314 requires that goods are fit for the ordinary purpose for which such goods are used. *See Alvarez v. American Isuzu Motors,* **749 N.E.2d 16, 22-23 (Ill. App. Ct. 2001).** Plaintiff argues that it is not required to establish privity at the motion to dismiss stage because such an inquiry is fact intensive. Alternatively, Plaintiff argues that it meets an exception to the traditional privity requirement because the product at issue—fish food—was in a sealed container and was intended for animal

consumption. The Court finds that at this juncture, Plaintiff's assertion that the fish food was not suitable for its ordinary purpose is enough to allow the claim to proceed beyond dismissal. As discussed above, in the discreet area of products intended for consumption that result in physical damage, precedent shows that courts have applied privity leniently. This Court agrees with the lenient approach in the case at bar. Thus, the motions to dismiss are denied as to the implied warranty of merchantability claims—Counts III and VII.

## C. Negligence

Finally, as to the negligence claims, Defendants argue that these claims are precluded by the economic loss doctrine—a doctrine barring recovery in tort for purely economic losses that fall within the purview of contract and the Uniform Commercial Code ("UCC") (Doc. 26 at 7-9; Doc. 32 at 7-9). Defendants contend that the facts of this case do not fall within any of the three exceptions to the doctrine (Doc. 26 at 7-9; Doc. 32 at 7-9).

In response, Plaintiff first argues that the economic loss doctrine does not apply because it is not seeking relief for purely economic damages—it is also seeking recovery for the deceased largemouth bass population (Doc. 35 at 6; Doc. 36 at 5). Second, Plaintiff argues that this case potentially fits into an exception to the economic loss doctrine, though it contends that the determination of which exception may apply is a

factual determination that should be left for resolution later in the case (Doc. 35 at 5-6; Doc. 36 at 5-6).

The *Moorman* doctrine is Illinois' economic loss doctrine, which holds that claims alleging only economic loss must proceed in contract, not tort. ***Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d at 448-49.** Economic losses include "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . '" ***Id.* at 449 (quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966)).** The *Moorman* court recognized "three exceptions to the economic loss rule: (1) where the plaintiff sustained damage; *i.e., personal injury or property damage*, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.,* fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." ***In re Chicago Flood Litigation*, 680 N.E.2d 265, 275 (Ill. 1997) (internal citations omitted) (citing *Moorman*, 435 N.E.2d 443).**

The sudden and dangerous occurrence exception to the *Moorman* doctrine consists of two elements: "(1) that the event at issue constituted a sudden and dangerous occurrence; and (2) that the damage sustained constituted 'property

damage.'" *ExxonMobil Oil Corp. v. Amex Constr. Co.*, **702 F. Supp. 2d 942, 968 (N.D. Ill. 2010).** Stated differently, the "exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage." *In re Chicago Flood Litigation*, **680 N.E.2d at 275.** When determining whether an occurrence is sudden, the court must focus on the suddenness of the injurious event, not the suddenness with which the underlying cause of the injurious event develops. *United Air Lines, Inc. v. CEI Indus. of Ill., Inc.*, **499 N.E.2d 558, 562 (Ill. App. Ct. 1986).** In other words, a suddenly occurring injurious event that resulted from a slow-developing cause still qualifies as a sudden occurrence. To satisfy the second prong of the sudden and dangerous exception, the property damage must be to property extrinsic from the allegedly defective product. *Progressive Northern Insurance Co. of Illinois v. Ford Motor Co.*, **2017 WL 1425953, *1, *4 (S.D. Ill. 2017) ("***Progressive***") (citing** *Trans States Airlines v. Pratt & Whitney Can., Inc.*, **682 N.E.2d 45, 54-55 (Ill. 1997);** *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, **763 N.E.2d 428, 436-37 (Ill. App. Ct. 2002)).**

To satisfy the fraud exception, the defendant must have intentionally, as opposed to merely negligently, made the misrepresentation. *In re Chicago Flood Litigation*, **680 N.E.2d at 275 (citing** *Moorman*, **435 N.E.2d 443).** Thus, "the second [fraud] exception to the *Moorman* doctrine cannot apply to a negligence claim." *Ibarolla v. Nutrex Research, Inc.*, **2012 WL 5381236,*1, *6 (N.D. Ill. 2012).**

To satisfy the negligent misrepresentation exception, a plaintiff must show:

(1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information.

*Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, **777 N.E.2d 603, 606 (Ill. App. Ct. 2002).** "This exception does not apply when the information 'supplied is merely ancillary to the sale [of a product or service] or in connection with the sale.'" *Id.* **(citing *Fireman's Fund Ins. v. SEC Donohue, Inc.*, 679 N.E.2d 1197 (Ill. 1997)).**

In an analogous, yet non-binding, case to the case at bar, the court held that the death of calves that allegedly resulted from their consumption of defective dry buttermilk powder satisfied the requirements of the sudden and dangerous exception to the *Moorman* doctrine. ***Starks Feed Co. v. Consol. Badger Coop., Inc.*, 592 F. Supp. 1255, 1257 (N.D. Ill. 1984).** In *Starks Feed*, the plaintiff alleged that the defendant feed company's defective product caused its calves to become sick and die at an unusually high rate. *Id.* Autopsies of the calves "revealed abraded, ulcerated and inflamed stomach and intestine linings." *Id.* The court focused on the property damage aspect of the two-pronged sudden and dangerous occurrence exception without explicitly discussing whether the calf deaths were sudden and dangerous. The *Starks Feed* Court denied the defendant's motion to dismiss because the plaintiff could "claim tangible property damage to other than the product itself, namely the calves. Therefore, its

claim fits within traditional definitions of non-economic loss, and it is entitled to proceed in tort." *Id.*

The outcome in *Starks Feed* squares with this Court's precedent regarding when the sudden and dangerous exception applies. As stated in a recent decision, "[f]ederal district courts interpreting Illinois law have [] concluded that when damages to other property are properly pleaded, 'the sudden and calamitous event exception to the economic loss rule . . . allows a plaintiff to pursue non-economic damages.'" ***Progressive*, 2017 WL 142593, at \*5 (citing *Allstate Ins. v. Pulte Homes of St. Louis, LLC*, 2010 WL 4482360, \*1, \*5 (N.D. Ill. 2010)).** While this Court limited recovery to damages extrinsic to the defective product (thereby preventing plaintiffs who satisfy the requirements of the sudden and dangerous exception from recovering for damage to the defective product itself), the reasoning in *Progressive* shows that, like in *Starks Feed*, damage to personal property can satisfy the requirements of the sudden and dangerous exception to the *Moorman* doctrine. ***Progressive*, 2017 WL 142593, at \*5.**

Here, Plaintiff alleges that it suffered property damage in excess of the value of the fish feed because its largemouth bass died. In *Starks Feed*, a case that involves livestock deaths following the consumption of allegedly defective feed (like the case at bar), the court did not explicitly perform a two-pronged analysis to determine the applicability of the sudden and dangerous exception. Yet, the court's decision to deny the defendant's motion to dismiss there suggests that livestock deaths preceded by

illness satisfy the suddenness component of the first prong.  This Court can also infer from *Starks Feed* that the death of livestock satisfies the dangerousness component of the first prong because Plaintiff's allegations, if proven, would show property damage because a significant number of the largemouth bass population died. (Doc. 1 at 10). Like the plaintiff in *Starks Feed*, Plaintiff here alleges damage to its livestock—damage that is extrinsic to the allegedly defective product. This Court finds that, in light of *Starks Feed* and other precedent, Plaintiff has set forth information sufficient to proceed beyond the motion to dismiss phase.  ***Starks Feed*, 592 F. Supp at 1257.**  Thus, the motions to dismiss Counts V and IX are hereby DENIED.

## V.    CONCLUSION

After a thorough review of the pleadings, the Court is left with many uncertainties about the applicability of various exceptions to this case.  However, the uncertainties are not a result of a deficient complaint, so much as they are a result of the interchangeable viability of many different theories of relief in consumer fraud, contract, and tort.  The Plaintiff has set forth sufficiently detailed information in the Complaint to warrant proceeding beyond dismissal on seven of the nine counts— Counts I, II, III, V, VI, VII, and IX.  Accordingly, the Motions to Dismiss (Docs. 27 and 31) are DENIED in part as to these counts, and are GRANTED in part as to Counts IV and VIII.

**IT IS SO ORDERED.**

**DATE:** October 6, 2017          *s/ Michael J. Reagan*
                                         **MICHAEL J. REAGAN**
                                         United States District Judge